

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No.<br>4:17-cv-151-LGW |
| TENNSTAR ENERGY, INC. f/k/a BLACK GOLD RESOURCES, INC., DAVID R. GREENLEE, DAVID A. STEWART, JR. AND RICHARD "RIC" P. UNDERWOOD, | |
| Defendants. | |

## FINAL JUDGMENT BY DEFAULT AS TO DEFENDANT TENNSTAR ENERGY, INC.

The Securities and Exchange Commission filed its Complaint against Tennstar Energy, Inc. f/k/a Black Gold Resources, Inc. ("Tennstar" or "Defendant") on August 11, 2017. The SEC served defendant Tennstar on its registered agent, and the entity's answer or responsive pleading was due September 6, 2017. Tennstar failed to file an answer or responsive pleading. The SEC moved for entry of default against Tennstar, and the Clerk granted the entry of default on September 13, 2017. Shortly thereafter this matter was stayed by Order of the Court pending resolution of three related criminal cases, *United States v. Underwood,* No. CR417-197 (S.D. Ga.); *United States v. Greenlee,* No. CR417-203 (S.D. Ga.); and *United States v. Stewart,* No. CR417-213 (S.D. Ga.), all of which arose from the same facts and circumstances as this civil enforcement action. By later order of this Court, the stay was extended to December 6, 2019. On that day, the SEC filed its motion for default judgment against Tennstar. The Court hereby grants the SEC's motion and has set forth relevant findings of fact and conclusions of law below, in addition to

1

injunctive relief, and the imposition of disgorgement, prejudgment interest, and a civil penalty as appropriate.

## FINDINGS AND CONCLUSIONS

The Declaration of Stephen E. Donahue, provided by the Commission establishes that from the Commission's investigation, disgorgement and prejudgment interest in specific amounts are appropriate based upon the knowledge of the declarant. (Donahue Declaration, ¶¶ 6-13). Given the failure of defendant Tennstar to answer or otherwise defend the allegations against it, the following allegations of the SEC's Complaint are now deemed to be true as to Tennstar and are made the findings of this Court:

### 1) Findings of Fact

1.      Between at least January 2013 and February 2016, Greenlee and Stewart, acting individually and through a network of salesmen whom they recruited and controlled, fraudulently sold to more than 150 investors at least $15 million of interests in various limited partnerships and joint ventures that were purportedly created to extract and sell oil from existing wells in Kansas, Oklahoma and Texas.   (¶1, Complaint).

2.      Greenlee and Stewart operated their scheme through two Tennessee corporations, Southern Energy Group, Inc. ("SEG"), which is now administratively dissolved, and Black Gold Resources, Inc. ("BGR"), which later changed its name to Tennstar Energy, Inc. ("Tennstar"). (¶2, Complaint).

3.      Richard P. Underwood ("Underwood") substantially assisted in the scheme.  He acted as a principal salesman of the offerings, helped draft the false offering materials given to investors and oversaw the operations of one of the boiler room sales teams that solicited and sold these investments. (¶3, Complaint).

4.      In soliciting investors, Greenlee, Stewart and Underwood represented that the limited partnerships and joint ventures would use investor funds to (a) acquire "working interests" in various oil wells and (b) employ enhanced oil recovery techniques, such as fracking, to develop and recover oil from the wells.  Greenlee, Stewart and Underwood also told investors that the entities would sell the oil in order to earn for investors returns ranging from 15 to 55 percent, or more, per year "for decades." (¶4, Complaint).

5.      These representations were false.  Although Greenlee and Stewart used a portion of investor money to produce oil from several wells that they controlled, they used nearly two-thirds of the $15 million of investor funds raised for their own benefit, to pay salesmen, such as Underwood, or to advertise for new investors for their scheme.  (¶5, Complaint).

6.      Of the funds they actually used for oil production, most was spent at only a few of the wells in order to create an appearance of activity to dupe investors who wanted to see the wells in production.  The small amount of oil produced was sold to generate nominal profits which, in turn, were distributed to various investors to lull or induce further investments. (¶6, Complaint).

7.      Greenlee, Stewart, and Underwood also represented that SEG would manage the limited partnerships and Tennstar would manage the joint ventures, and that each of these companies was headed by an individual experienced in the oil industry.  (¶7, Complaint).

8.      In fact, neither SEG, nor Tennstar was managed by someone with experience in the oil industry.  Instead, Greenlee and Stewart installed figureheads that had little or no experience in the oil industry and created and distributed false biographies for these figureheads that misrepresented that they had significant relevant experience. (¶8, Complaint).

9.      When soliciting investors themselves, Greenlee and Stewart used fake names to

3

hide their identities and criminal records. (¶9, Complaint).

10.     Underwood knew of these falsehoods, helped facilitate the sales, and was aware that investor funds were being dissipated. (¶10, Complaint).

11.     As a result of the conduct described in this Complaint, Tennstar, Greenlee, Stewart and Underwood (collectively, the "Defendants"), directly or indirectly, have engaged and unless enjoined, will engage in violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. (¶11, Complaint).

12.     The Commission brings this action pursuant to Sections 20(b), (c) and (d) of the Securities Act [15 U.S.C. §§ 77t(b)-(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)-(e)] to enjoin the Defendants from engaging in the transactions, acts, practices and courses of business alleged in this Complaint, and transactions, acts, practices and courses of business of similar purport and object, for disgorgement of illegally obtained funds, prejudgment interest and other equitable relief, and for civil money penalties. (¶12, Complaint).

13.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e) and 78aa]. (¶13, Complaint). (¶13, Complaint).

14.     The Defendants, directly and indirectly, have made use of the mails, the means and instrumentalities of transportation and communication in interstate commerce, and the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint. (¶14, Complaint).

15.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §

4

77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices and courses of business constituting violations of the Securities Act and Exchange Act have occurred within the Southern District of Georgia. Moreover, the Defendants have solicited and obtained investors in this fraudulent offering who reside within the State of Georgia, including within the Southern District of Georgia. (¶15, Complaint).

16.     **Tennstar Energy Inc.** is a Tennessee corporation formerly known as **Black Gold Resources, Inc.** It was formed in December 2013 to serve as the purported manager of the joint ventures that Greenlee, Stewart and Underwood offered and sold to investors. In January 2016, BGR changed its name to Tennstar following a trademark dispute with another, unrelated entity. (¶16, Complaint).

17.     **David R. Greenlee**, aged 41 at the time of the SEC's Complaint, and a resident of Gallatin, Tennessee, was convicted in state court and served time in a Kentucky prison during 1999 to 2000 for forgery and burglary, and again in 2004 for vehicular manslaughter. Following his most recent incarceration from 2007 to 2009 for probation violations, Greenlee became involved in various unregistered securities offerings. Through one such offering, he became friends with Stewart, who was a fellow salesman. When communicating with investors regarding the offer and sale of the investments at issue here, Greenlee frequently used the aliases "David Johnson" or "David Morrill" to conceal his criminal record. (¶17, Complaint).

18.     **David A. Stewart, Jr.**, aged 46 at the time of the SEC's Complaint, and a resident of Gallatin, Tennessee, is a former registered representative of two Commission-registered broker-dealers in 2001 and 2002. He previously held FINRA series 22 and 63 licenses. Stewart became friends with Greenlee while working with him in selling unregistered securities offerings. In 1998, the Wisconsin Division of Securities issued a prohibition and

revocation of exemptions order against Stewart, among others, for fraud in the offer of securities by an unlicensed broker-dealer which had falsely claimed in a filing with state regulators that the entity did not pay commissions for the sale to investors of its natural gas well investment "units." In April 2007, Stewart was convicted of federal income tax evasion and sentenced to federal prison. Later, in 2008, the Alabama Securities Commission issued a cease-and-desist order against Stewart, among others, for previously participating in a separate oil and gas offering scheme. As part of the SEG and Tennstar schemes, Stewart used the alias "David Johnson," to conceal his criminal and disciplinary history from investors. (¶18, Complaint).

19.     **Richard "Ric" P. Underwood**, aged 65 at the time of the SEC's Complaint, and a resident of Fort Lauderdale, Florida, held the title of Tennstar's Vice President of Sales. In addition to his selling duties, Underwood assisted in drafting many of the limited partnerships' and joint ventures' offering materials. From 1994 to 1997, Underwood was a registered representative of a broker-dealer unrelated to this case and held FINRA series 22, 24, 39, 62 and 63 licenses. In 1996, a former customer won a $25,000 arbitration award against him for investment misrepresentations. Underwood worked with Stewart for a period of time at another broker-dealer. The State of Wisconsin also issued a cease-and-desist order against Underwood in 1998 for his role in the fraudulent offer and sale of securities. The State of Alabama also issued a cease-and-desist order against Underwood in 2006 for his role in offering and selling securities while unregistered with the state. In 2007, Underwood pled guilty to federal income tax evasion. (¶19, Complaint).

20.     **Southern Energy Group, Inc.** was a Tennessee corporation that Greenlee and Stewart formed, through an intermediary whom they controlled, in January 2013. SEG served as the purported manager of oil and gas limited partnerships in which Stewart, Greenlee and

Underwood sold interests to investors.  In August 2016, the State of Tennessee administratively dissolved SEG. (¶20, Complaint).

21.     **Robert Dorrance**  ("Dorrance"), aged 60 at the time of the SEC's Complaint, and a resident of Gallitin, Tennessee was a relative of Greenlee's wife and was recruited by Greenlee to serve as the President of SEG.  Despite his title of President, Dorrance had no control over SEG.  Instead, Greenlee and Stewart controlled SEG, providing Dorrance with assignments and tasks and determining his salary. (¶21, Complaint).

22.     Dorrance was featured prominently on the SEG website, which described him as having "nearly 40 years of business experience" and "association with some of the most capable and experienced professionals in the oil industry."  In truth, Dorrance never worked in oil development.  His prior work was selling stereos and helping to manage his spouse's dental practice. (¶22, Complaint).

23.     **Jared G. Forrester** ("Forrester"), aged 33 at the time of the SEC's Complaint, and a resident of Glasgow, Kentucky, was a friend of Stewart.  Stewart and Greenlee directed Forrester to incorporate BGR (later known as Tennstar) with the State of Tennessee and installed him as the company's CEO and president to conceal their involvement with their company given their criminal backgrounds. (¶23, Complaint).

24.     Despite his title, Forrester had no control over BGR or Tennstar.  Instead, he worked under the direction of Greenlee and Stewart, as they set Forrester's salary and gave him assignments to complete.  At the direction of Greenlee and Stewart, Forrester sold interests in the BGR/Tennstar oil joint ventures to investors in numerous states and signed ownership unit certificates that were sent to investors on behalf of BGR/Tennstar. (¶24, Complaint).

25.     Contrary to statements in the websites and offering literature for BGR/Tennstar,

Forrester had no meaningful experience in the oil industry.  He previously worked as a stockbroker trainee, a hotel worker, and a furniture store salesman. (¶25, Complaint).

### A.     Stewart and Greenlee Create SEC and Tennstar and Install Figureheads to Conceal Their Involvement

26.     After becoming friends while selling investments at an unrelated broker-dealer, Greenlee and Stewart began working together again selling oil investments through TexStar Energy Corp. ("TexStar"), an entity that they did not own or control. (¶26, Complaint).

27.     Not long thereafter, Greenlee and Stewart decided to create their own entity to offer and sell investments in oil development ventures.  Specifically, in January 2013, Greenlee and Stewart, through an intermediary, incorporated SEG in Tennessee in order to receive investor funds and otherwise help orchestrate the fraud. (¶27, Complaint).

28.     To run SEG over the longer term while hiding their involvement due to their criminal histories, they installed Dorrance, a relative of Greenlee's wife, to become SEG's nominal president.  Although Dorrance had no experience in the oil industry, Greenlee and Stewart drafted fake biographical information for SEG's website and brochures, falsely describing Dorrance as having, among other attributes, "years of experience in finance, sales, oil & gas, and almost every capacity of corporate America." (¶28, Complaint).

29.     In truth, Dorrance's prior work involved selling stereos and helping manage his spouse's dental practice. (¶29, Complaint).

30.     Later, in 2013, Greenlee and Stewart created a second entity, using an intermediary as they did with SEG, to help them perpetrate the fraud.  Specifically, in December 2013, Greenlee and Stewart recruited Forrester to file incorporation documents for BGR (later known as Tennstar) with the State of Tennessee. (¶30, Complaint).

31.     Stewart and Greenlee then installed Forrester as the company's CEO and president to conceal their involvement with their company given their criminal backgrounds. (¶31, Complaint).

32.     Installing Forrester as the CEO-in-name-only of BGR/Tennstar was necessary, Greenlee explained to Forrester in a message on August 20, 2014, because "[t]he rest of us are the Manson family," alluding to the criminal and disciplinary records of others involved in the scam, such as Greenlee and Stewart. (¶32, Complaint).

33.     As they did with Dorrance, Greenlee and Stewart drafted fake biographical information about Forrester for BGR's website and offering brochures, touting Forrester as an experienced oil and gas executive.  For example, Tennstar's website and offering brochures described Forrester as having "used his personal and business relationships to locate prime oil and gas properties in Texas and Oklahoma."  This was false.  Forrester was a former stockbroker trainee, former hotel worker, and former furniture salesman with little or no experience in the oil and gas industry. (¶33, Complaint).

34.     Both Forrester and Dorrance acted in their roles largely—if not solely—at the direction of Greenlee and Stewart. (¶34, Complaint).

35.     In fact, in an email exchange on January 5, 2015, Greenlee and Stewart discussed whether to get rid of Dorrance and "merge SEG and BGR," and, as a result, send Forrester to run SEG.  Stewart, concerned by the mistakes and failure of Dorrance to follow directions on certain tasks, urged Greenlee in a text: "Get ya boy under control quick please." (¶35, Complaint).

**B.     The Selling Effort**

36.     Along with creating SEG and Tennstar, Greenlee and Stewart drafted offering documents largely modeled after TexStar documents to which they had access, often using the same maps and stock photos from the TexStar materials.  (¶36, Complaint).

9

37.     Greenlee and Stewart decided that SEG would offer Tennessee "limited partnerships" and Tennstar would offer Tennessee "joint ventures." (¶37, Complaint).

38.     The joint ventures were described in offering documents by Tennstar as operating with the same status as general partnerships under Tennessee law. (¶38, Complaint).

39.     Greenlee and Stewart also decided that SEG would primarily seek to solicit "accredited" investors, while Tennstar would purportedly focus on selling investments to non-accredited investors. (¶39, Complaint).

40.     From 2013 to 2015, SEG and its affiliated partnerships filed various Forms D with the Commission for the offer of interests in limited partnerships. For BGR/Tennstar, Forms D were filed for the first two joint venture offerings that BGR/Tennstar sold to investors in 2014. Thereafter, BGR/Tennstar filed no additional Forms D with the Commission for additional offers of joint venture interests from later in 2014 through 2016. (¶40, Complaint).

41.    In fact, these investments were securities. (¶41, Complaint).

42.     Greenlee and Stewart also recruited a former colleague, Underwood, to handle editing the various private placement memoranda and brochures that they created as the fraud unfolded. (¶42, Complaint).

43.     In actuality, Underwood did little more than change the names of the offering entities on the materials, vary the terms relating to specific land leases and offering unit amounts, and swap in the appropriate fake leadership biographies for either Dorrance or Forrester. (¶43, Complaint).

44.     The offering materials contained numerous typographical errors from the constant copying and pasting of certain language, as well as from the attempts to convert documents from

limited partnership offerings by SEG into offering documents for Tennstar's joint venture interests. (¶44, Complaint).

45.     In offering materials that Greenlee, Stewart and Underwood drafted and gave to investors, the offerings were described as intending to generate a profit for investors by using investor funds to acquire "working interests" in specifically identifiable oil well leases in various counties in Texas, Oklahoma and Kansas. (¶45, Complaint).

46.     Each "working interest" was defined to represent a certain "net revenue interest" in the oil wells. (¶46, Complaint).

47.     SEG or Tennstar represented in their offering materials that they would use investor funds to develop and implement enhanced oil recovery techniques, such as fracking, at the oil wells. (¶47, Complaint).

48.     Investors were told that this sale of oil, in turn, would supposedly generate a return for each limited partnership's or joint venture's investors of as much as 55 percent per year "for decades" into the future. (¶48, Complaint).

49.     Greenlee, Stewart and Underwood also recruited salesmen for the offerings and set up two locations that would operate as "boiler rooms," with salesmen telephoning investors from a central location (using a sales leads list) and persuading certain individuals to invest by using sales scripts provided by Greenlee, Stewart and Underwood. (¶49, Complaint).

50.     SEG and Tennstar also advertised their offerings on television, radio and the internet. Prospective investors were encouraged to call certain numbers or send e-mails with particular information about themselves. Greenlee, Stewart and Underwood and the sales teams would then sort through which investors to contact and which offering to present to each investor for consideration.  (¶50, Complaint).

11

51.     SEG's limited partnership interests were sold from an office in the suburbs of Nashville, Tennessee, while interests in Tennstar's joint ventures were sold from an office near Fort Lauderdale, Florida.  Underwood coached new salesmen, often in response to directions from Greenlee and Stewart, and helped close certain sales over the phone.  (¶51, Complaint).

52.     Greenlee and Stewart participated in some of the calls by their sales staff, using fake names, to help complete the sales. (¶52, Complaint).

53.     Tennstar offerings were also marketed on the internet through video advertisements on YouTube in which a paid spokesman, reading a script provided by Underwood, described the offerings as an "investment" that was "tailored for the savvy, conservative investor" and was "specifically designed to deliver safe and consistent 20 to 30 percent annual returns that can last for decades." (¶53, Complaint).

### C.     The Partnerships and Joint Ventures

54.     Between approximately 2013 and February 2016, the Defendants offered and sold to at least 150 investors at least $15 million of interests, or "units," in more than ten limited partnerships or joint ventures. (¶54, Complaint).

55.     Not all offerings were concurrently sold to investors.  Instead, typically, one or two limited partnerships or joint ventures were sold at the same time.  When "units" in those offerings were completely subscribed, new limited partnerships or joint ventures were created and offered for sale to investors. (¶55, Complaint).

56.     As alleged in more detail below, on at least one occasion, the working interests that Defendants sold in an oil well exceeded 100 percent. (¶56, Complaint).

*SEG-Tenney Creek Development, LP*

12

57.     Greenlee, Stewart and Underwood sold limited partnership interests in SEG-Tenney Creek Development, LP ("Tenney Creek") between approximately August 2015 and February 2016. (¶57, Complaint).

58.     The Tenney Creek offering materials given to investors described the investment as an opportunity to buy units in a Tennessee limited partnership for which SEG served as the Managing General Partner.  The private placement memorandum (the "Tenney Creek PPM") explained that Tenney Creek was seeking to raise $3.5 million through the sale of 50 limited partnership units, which were being offered to accredited investors pursuant to Rule 506(c) of Regulation D under the Securities Act. (¶58, Complaint).

59.     The Tenney Creek PPM further stated that Tenney Creek was to use the investor funds to acquire a 75 percent working interest in twenty-one wells located in Caldwell County, Texas, on what was known as the "Garner-Williams" leases.  SEG, as Managing General Partner, had supposedly already entered into a "Turnkey Completion Contract" with Tenney Creek pursuant to which the limited partners (*i.e.* the investors) would provide the funds to "furnish the equipment, labor, and services" for the wells.  In return, the investors in Tenney Creek, on a *pro rata* basis tied to their units owned, would share in any profits of the oil wells. (¶59, Complaint).

*GW 21 Joint Venture*

60.     Between approximately August 2015 and the end of December 2015, Greenlee, Stewart, and Underwood offered and sold interests (or units) in GW 21 Joint Venture ("GW 21 JV") to investors.  The confidential information memorandum for GW 21 JV (containing numerous typographical errors from having been edited and re-used from prior offerings) stated that the joint venture was a chance to buy joint venture units in a Tennessee

joint venture for which Tennstar (still called BGR at that time) served as the Managing Venturer. (¶60, Complaint).

61.     The offering memorandum for GW 21 JV noted that forty (40) joint venture units were being sold by Tennstar for $93,400 per unit.  Investors were told that Tennstar would use funds raised to acquire working interests in twenty-one wells on the "Garner-Williams" leases in Caldwell County, Texas—the same twenty-one wells identified in the Tenney Creek offering involving SEG. (¶61, Complaint).

62.     Specifically, investors were told that Tennstar "currently own[ed] or will own" eighty percent of the working interest in the twenty-one wells.  This meant, in effect, that, while Greenlee, Stewart, and Underwood were selling investments in Tenney Creek to acquire seventy-five percent of the working interest in the twenty-one wells on the Garner-Williams leases, they also were concurrently selling GW 21 JV investments, seeking to acquire eighty percent of the working interest in the same twenty-one wells on the same land in Texas. (¶62, Complaint).

63.     Maps in the offering materials for each respective offering are essentially the same—showing the same land leases to be acquired in both offerings.  Moreover, the maps used in each offering are identical to maps used within older offering materials distributed by TexStar. (¶63, Complaint).

64.     The GW 21 JV offering memorandum further explained that the venture would have the same status of a general partnership under the laws of Tennessee, and that "the management of the Operations and other business of the Venture shall be the responsibility of all the Venturers," (*i.e.* the investors buying interests in GW 21 JV). (¶64, Complaint).

65.     However, GW 21 JV, as well as four additional Tennstar joint venture offerings that did not file Forms D with the Commission, were not *bona fide* joint ventures.  The

14

individuals who bought interests in GW 21 JV did not have any meaningful control over the ventures and did not have any means of contacting each other or knowing the identities of the other participants. (¶65, Complaint).

66.        The participants were merely passive investors who provided money and waited for their oil production checks and paperwork from Tennstar that would allow for tax deductions to be claimed.  The participants had no knowledge or ability to play any role in the recovery or development of oil from the purported oil well projects.  Many investors in GW 21 JV were retirees. (¶66, Complaint).

67.        Further, the GW 21 JV memorandum explained that Tennstar had been appointed as the initial Managing Venturer and that Tennstar's "decisions concerning the day-to-day affairs and the Operations for the venture by [Tennstar] shall be binding upon each of the Venturers and the Venture." (¶67, Complaint).

### D.        Defendants Misrepresent that Investor Funds Would Be Used to Extract Oil

68.        Upon information and belief, Greenlee and Stewart had actually acquired legal interests in various oil wells in Texas.  They purportedly held these interests through Enhanced Recovery Solutions, Inc. ("ERS"), a Nevada company that they controlled. (¶68, Complaint).

69.        Contrary to their representation that investor funds would be used for oil development and recovery, however, Greenlee and Stewart diverted significant funds for other purposes. (¶69, Complaint).

70.        Specifically, Dorrance and Forrester, acting at the direction of Greenlee and Stewart, caused both SEG and Tennstar to send investor funds to ERS.  Greenlee and Stewart controlled ERS and used it to funnel investor funds to various shell companies for their personal

15

spending, to pay their "boiler room" sales teams, and to pay the expenses such as the *de minimis* oil well operations that were put on for show to lull investors. (¶70, Complaint).

71.     Greenlee and Stewart divided investor funds, using what they called the "Rule of Thirds." Under this practice, only roughly one third of the investor funds raised in the offerings was placed into oil drilling and production (though, some of this was merely used to paint old oil equipment to look new). This was done to create an appearance of activity around the wells to show to curious investors and prospective investors, and to produce some oil – albeit a small quantity – to sell to third-party buyers. The profits from these sales were periodically paid in small amounts to investors to show them at least some return on their investments – though investors usually received no more than $100 or so from "distribution checks." (¶71, Complaint).

72.     Another third of investor funds was used to fund compensation for the salesmen, such as Underwood, and to pay for advertising. Finally, the remaining third was misappropriated by Greenlee and Stewart. (¶72, Complaint).

73.     The majority of this misappropriation did not occur directly from the bank account of ERS. While some personal expenses were paid directly from ERS, much of the money received by ERS was paid back out in response to fake invoices for supposed oil development consulting and production costs from additional entities controlled by Greenlee and Stewart. (¶73, Complaint).

74.     In the case of Greenlee, his portion of misappropriated funds was paid to Strategic Energy Consultants, Inc., an entity he controlled, while Stewart had his portion of misappropriated funds paid to PetroDrill, Inc., Petro Professional, Inc., or Petroleum Consulting, LLC, all of which he controlled. (¶74, Complaint).

16

75.     Moreover, certain wells that were portrayed to investors as producing oil were not in operation. (¶75, Complaint).

76.     For instance, of the twenty-one wells included in the Garner-Williams leases and "double-sold" by Greenlee and Stewart in both the Tenney Creek and GW 21 JV offerings, only several wells were ever operational and producing oil. (¶76, Complaint).

77.     Because so few wells were made operational through the promised fracking operations, Greenlee and Stewart occasionally used funds raised from new investors to pay returns to investors from prior projects. (¶77, Complaint).

78.     Investors were also told on occasion that they needed to pay "assessments" to SEG and Tennstar for broken equipment or additional oil well work – when, in reality, the funds were needed to pay the SEG and Tennstar salesmen or fund Greenlee's and Stewart's extravagant spending, including a boat, luxury housing, gold coins, travel, and personal shopping. (¶78, Complaint).

79.     Additionally, Greenlee and Stewart made no effort to segregate the *de minimis* profits that were made when the small quantities of extracted oil from the working wells were sold. This meant that, when investors were paid returns from oil sales profits, those profits were frequently from wells that were not included in their offerings and, therefore, those profits belonged to other investors. (¶79, Complaint).

80.     Various SEG and BGR/Tennstar investors were falsely told by the Defendants before investing that their money would go toward oil development and production. For instance, an investor from Monroe, Georgia who invested $40,000 in SEG's Lone Star Enhanced Recovery, LP in June 2015, first heard of SEG while listening to advertisements during *The Rush Limbaugh Show*. (¶80, Complaint).

17

81.     The Monroe, Georgia investor called the number advertised for SEG and spoke

with a salesman who told the Monroe, Georgia investor that investors' money was going to

purchase oil development equipment.  The Monroe investor invested $40,000 and received a

certificate from SEG showing that he had acquired a ½ unit in SEG's Lonestar limited

partnership.  However, as explained above, the investor's funds were largely used to pay for

Tennstar salesmen's commissions, as well as advertising to lure future investors and to bankroll

the lavish lifestyles of Greenlee and Stewart. (¶81, Complaint).

E.      **Defendants Solicited Investors in the Southern District of Georgia**

82.     Upon information and belief, a potential investor in the Southern District of

Georgia responded to a Tennstar (then BGR) radio advertisement in 2015 touting high returns

from an oil-drilling investment opportunity. (¶82, Complaint).

83.     The Southern District of Georgia investor called the telephone number from the

radio advertisement and left a message indicating that he was interested in making an

investment.  Three days later, a Tennstar salesman returned the call and told the investor that a

25 percent annual return on investment was "very obtainable" for Tennstar investors.  The

salesman further told the Southern District of Georgia investor that Tennstar was seeking to raise

$2 million from 20 investors at $50,000 each in order to re-pressurize previously capped wells in

Caldwell County, Texas. (¶83, Complaint).

84.     The salesman said that the investment would be nearly 100 percent tax deductible

and that the Southern District of Georgia investor would start receiving monthly paychecks from

Tennstar within 60 to 90 days.  The investor asked the salesman to provide offering materials,

which the salesman sent to the investor at a mailbox in Savannah, Georgia.  That packet included

18

an investor agreement, oil well survey plats and instructions on wiring funds to Tennstar at a specific bank account. (¶84, Complaint).

85.     The Southern District of Georgia investor had several more phone calls with Tennstar salesmen in October 2015, including with Underwood and Stewart. During one of the final calls, the investor was told by a Tennstar salesman that he should speak with a man named "Dave," who was Tennstar's "project coordinator" for the offering. During a conversation, the Tennstar salesman placed a conference call to a man who identified himself as "David Johnson." (¶85, Complaint).

86.     Upon information and belief, this person was Stewart using a fake name. During the conversation and while posing as "Dave Johnson," Stewart told the Southern District of Georgia investor that the project "can do 15 to 25 percent return," and said the oil recovery techniques being used by Tennstar would lead to "big reserves" of energy that "will be here a long time after you and I are gone," providing "20, 30, 40 years of production at least." Stewart stressed that the money raised would be used to acquire land leases and to pay for the oil productions – making no mention of any investor funds being used to pay for advertisements, for the Tennstar boiler room salesmen or to pay Greenlee and Stewart. (¶86, Complaint).

87.     The Southern District of Georgia investor then invested $28,000 in a Tennstar offering by sending a check to a Tennstar address in Tennessee. The check was endorsed and deposited by Forrester into a Tennstar account at Bank of America. Forrester subsequently sent the Southern District of Georgia investor a Tennstar joint venture "unit" ownership certificate that Forrester had signed. The certificate indicated that the Southern District of Georgia investor had bought half a unit in a Tennstar (then BGR) offering called the GW 21 Joint Venture.

However, the Southern District of Georgia investor never received any profits or distributions checks from Tennstar. (¶87, Complaint).

88.     Separately, responding to a radio advertisement for SEG, another potential investor from the Southern District of Georgia called the phone number in the advertisement. The second would-be investor spoke with a SEG salesman who identified himself as SEG's Vice President of Corporate Development. (¶88, Complaint).

89.     The SEG salesman told the Southern District of Georgia potential investor that SEG was offering investments with a 75 percent return on investment in the first year and promised monthly revenue checks.  The SEG salesman also described roughly 1.6 million barrels of recoverable oil in place – however, Texas Railroad Commission records show that SEG never recovered more than a few thousand barrels total from the property. (¶89, Complaint).

90.     Ultimately, the second potential Southern District of Georgia investor did not invest in the offering. (¶90, Complaint).

91.     Upon information and belief, the fraudulent sales of the securities offerings described in this Complaint effectively ended approximately February 2016. (¶91, Complaint).

### INJUNCTIVE AND OTHER RELIEF

#### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant Tennstar is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Default Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a). Specifically, Tennstar is

permanently enjoined from conduct which, among other things, includes: i) without disclosure to

investors, using any partial portion of investor funds for other than the stated, intended purpose;

ii) without disclosure to investors, misappropriating the any portion of funds raised by the parties

to use to finance their continuing fraud via payments to boiler room sales teams or other

"expenses;" iii) falsely portraying supposed revenue producing instruments as generating

revenue producing product when such instruments were never actually in operation; iv) double

selling securities to multiple investors; v) raising funds from new investors to pay earlier

investors; and vi) falsely touting unrealistic returns while having little or no basis in fact to do so.

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

Tennstar is permanently restrained and enjoined from violating Section 17(a) of the Securities

Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.


IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).  Specifically, Tennstar is permanently enjoined from conduct which, among other things, includes: i) without disclosure to investors, using any partial portion of investor funds for other than the stated, intended purpose; ii) without disclosure to investors, misappropriating the any portion of funds raised by the parties to use to finance their continuing fraud via payments to boiler room sales teams or other "expenses;" iii) falsely portraying supposed revenue producing instruments as generating revenue producing product when such instruments were never actually in operation; iv) double

22

selling securities to multiple investors; v) raising funds from new investors to pay earlier

investors; and vi) falsely touting unrealistic returns while having little or no basis in fact to do so

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

Tennstar is liable for disgorgement of $5,968,320, representing profits gained as a result of the

conduct related to the Tennstar offerings alleged in the Complaint, together with prejudgment

interest thereon in the amount of $1,046,459.34, for a total of $7,014,799.34. Defendant

Tennstar shall satisfy this obligation by paying $7,014,799.34 to the Securities and Exchange

Commission within 30 days after entry of this Final Judgment by default. Tennstar operated

ultimately as a "pass through" of its ill-gotten gain for the benefit of its codefendants, Defendants

Greenlee, Stewart and Underwood. Therefore, any amount up to and including $7,014,799.34

that Defendants Greenlee, Stewart or Underwood (representing profits related to the Tennstar

offerings) is ordered to pay in disgorgement (and does in fact pay), should offset the amount by

which Defendant Tennstar is obligated to pay pursuant to this judgment.

Defendant Tennstar may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Defendant Tennstar may also pay by certified check,

bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

23

this Court; Tennstar Energy, Inc. as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action to Edward G. Sullivan, Esq., Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326.  By making this payment, Defendant Tennstar relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission shall hold the funds (collectively, the "Fund") and may propose a plan to distribute the Fund subject to the Court's approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Court shall retain jurisdiction over the administration of any distribution of the Fund.  If the Commission staff determines that the Fund will not be distributed, the Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after 30 days following entry of this Final Judgment.  Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant Tennstar shall pay a civil penalty in the amount of $ 80,000 pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].  Defendant Tennstar shall make this payment within thirty (30) business days after entry of this Default Judgment.  Defendant Tennstar may transmit payment electronically to the

24

Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.

Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Tennstar Energy, Inc. as a defendant in this action; and specifying that payment is

made pursuant to this Default Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case

identifying information to the Commission's counsel in this action to Edward G. Sullivan, Esq.,

Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA

30326.  By making this payment, Defendant Tennstar relinquishes all legal and equitable right,

title, and interest in such funds and no part of the funds shall be returned to Defendant.  The

Commission shall send the funds paid pursuant to this Default Judgment to the United States

Treasury.  Defendant Tennstar shall pay post judgment interest on any delinquent amounts

pursuant to 28 U.S.C. § 1961.

The Commission may propose a plan to distribute the Fund subject to the Court's

approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund

provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Court shall retain

jurisdiction over the administration of any distribution of the Fund.  If the Commission staff

determines that the Fund will not be distributed, the Commission shall send the funds paid

pursuant to this Final Judgment to the United States Treasury.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that it is entitled to, nor shall it further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

26

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.  There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

This _15_ day of _Jan_, 20_20_.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

27